**UNITED STATES of America ex rel. Russell Davis MEALEY, Jr., Petitioner,**

**v.**

**The STATE OF DELAWARE, Respondent.**

**No. 170.**

United States District Court, D. Delaware.

March 7, 1973.

Richard W. Pell, Wilmington, Del., for petitioner.

Francis A. Reardon, Deputy Atty. Gen., Wilmington, Del., for respondent.

OPINION

STEEL, District Judge.

An evidentiary hearing was held pursuant to this Court's Opinion of December 8, 1972, reported in 352 F.Supp. 349, and Order therein, to determine the validity of Mealey's waiver of his constitutional rights against self-incrimination and to an attorney. The Order also directed an evidentiary hearing on the validity of Mealey's arrest under 11 Del. C. § 1906(b)(1), but no evidence was offered on this latter issue. The initial question for determination in this proceeding, therefore, is whether the State bore the heavy burden imposed by the *Miranda* decision of establishing that Mealey knowingly and intelligently waived his rights.

Appended is a "Rights Form" used by the New Castle County Police to advise Mealey of his constitutional rights. The testimony of Officers Dale and Larotonda, read together, establishes that before any interrogation of Mealey commenced, each of the "Rights Form" statements and questions was read to him seriatum; that after each he wrote "yes", and by shaking his head and more or less mumbling, he indicated he understood the statements and questions. Later he initialed each "yes" and signed his name at the bottom of the form. His signing of the form was witnessed and subscribed to by three officers, one of whom also witnessed Mealey's initials on each of the "yeses" by initialing it.

Mealey gave the first five "yeses" in response to statements of his constitutional rights followed by the question "Do you understand?". The sixth "yes" was in response to the following:

> "Do you want to either talk with a lawyer at this time, or to have a lawyer with you while we ask you questions. Do you understand?"

The purport of the affirmative answer given by Mealey is ambiguous. His answer was in effect to three questions: (1) whether he wanted to talk to a lawyer, or (2) have a lawyer with him while he was asked questions, or (3) whether he understood. Mealey contends that in responding "yes" he meant that he wanted to talk to a lawyer and have one with him while he was interrogated.* This contention is unacceptable in view of Mealey's affirmative responses to the last two questions:

> "Do you now understand all of your rights which we have just explained?
>
> With these rights in mind, are you willing to talk to us without a lawyer to represent you?"

Mealey's last answer was a forthright declaration that he desired no lawyer to represent him during his questioning. Whatever uncertainty might otherwise have existed concerning Mealey's intention in answering the sixth question was dispelled by his response to the final question.

Mealey argues that no significance can be attached to his last answer since he had previously, by his answer to the sixth question, made known his desire to have an attorney. He points out that in *Miranda* the Court stated that if an accused indicates

> "that he wants an attorney, *the interrogation must cease* until an attorney is present." (emphasis added) 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694.

* At the trial Mealey testified that he told the police officers that he wanted an attorney. This testimony was refuted by Dale. Mealey did not testify at either of the two hearings held in this Court.

This caveat against further interrogation restricts the police from examining an accused with reference to matters relevant to the charge against him. It was not intended to reach preliminary inquiries concerning his understanding and waiver of his rights as was true of the last question addressed to Mealey.

Whether Mealey had the mental competence to waive his rights is, of course, highly relevant in ascertaining whether he waived them knowingly and intelligently. Critical to this determination is the testimony of Dr. Galliani, chief psychologist at the Delaware State Hospital and Dr. Weintraub, a psychologist in private practice in Wilmington, who acts as a consultant to various city agencies. Both had testified at the trial, and that testimony is discussed in this Court's Opinion of December 8, 1972. Their testimony before this Court was, in a sense, supplemental to that which they had given at the trial.

Dr. Galliani had been the chief psychologist at the Governor Bacon Health Center, a residential treatment center for emotionally disturbed children, from 1960 to 1963 when Mealey was there. During this time he had frequent contact with Mealey, on an almost weekly and sometimes daily and nightly basis. Dr. Galliani had also examined Mealey one time in 1969 before his trial. He was in a particularly favorable position to evaluate Mealey's ability to understand the "Rights Form" questions and the answers which he gave.

Academic tests conducted by Dr. Galliani placed Mealey's competence in reading, spelling and arithmetic between the second and third grade, a "mentally defective range" for a 20 year old. Emotionally, in terms of reaction to stress, Dr. Galliani said Mealey acted more like a three or four year old than an adult.

Dr. Galliani was asked to assume that Mealey had committed the crimes of rape and burglary sometime between 3:00 a. m. and 5:00 a. m. on September 17, 1969, had been arrested at approximately 9:00 a. m. the same morning and taken to the New Castle County Police Department by two officers, and there, while sober, was interrogated at approximately 9:35 a. m. in the presence of four officers. Dr. Galliani was then asked whether, having in mind his clinical knowledge and familiarity with Mealey, he would have been able to intelligently understand the question "Do you want to either talk with a lawyer at this time, or to have a lawyer with you while we ask you questions. Do you understand?" Dr. Galliani replied that he could not answer the question because of semantic problems involved. Dr. Galliani's attention was then directed to Mealey's affirmative answer to the last question which indicated that Mealey was willing to talk to the police without a lawyer representing him. Dr. Galliani was asked whether he had any doubt about Mealey's understanding that question. He replied:

> "THE WITNESS: I think that it might have been difficult for Russell [Mealey] to keep all of these statements in mind, whether or not he was sober.
>
> I think the last statement, perhaps as a summary statement, if Russell had any questions, he would have asked, knowing Russell.
>
> THE COURT: He could understand it and intelligently and understandingly answer it?
>
> THE WITNESS: I think he could. . . ."

Dr. Weintraub testified that he had examined Mealey on only one occasion. That was in preparation for Mealey's trial. Based on this examination, Dr. Weintraub stated that it was his opinion that Mealey would have been able to understand the "Rights Form" questions "as a totality". He amplified this statement however, by saying that the conditions under which Mealey was interrogated would affect his answers. Upon the postulation of facts largely as they had been hypothesized to Dr. Galliani (see text *supra*), Dr. Weintraub was

asked whether in view of his understanding of Mealey's emotional and mental stability, Mealey, if interrogated by four police officers, would have been able to understand the "Rights Form" and to waive his rights. He answered:

> "It would depend a great deal upon how the interrogation was—the method of interrogation at the time. If Russell Mealey perceived the situation through hazy eyes because of extreme fatigue, plus the intensity of the complications of the assault, and if he perceived the situation as one in which he was trapped, then it would be very difficult for him to organize his reasoning and come forth with a consistent intellectual and objective evaluation of what was happening around him."

Later he was asked:

> "THE COURT: Is it your opinion that after Mr. Mealey had the questions propounded in a reasonable way and had answered them as has been testified to that he would understand that he would not have to give any statement to the police if he didn't want to?
>
> THE WITNESS: On the basis of the—
>
> THE COURT: Your examination of him.
>
> THE WITNESS: I think if it were reasonable and he were not under heavy pressure and heavy fatigue that he would have an understanding."

Dr. Weintraub expressed this same opinion when asked about Mealey's ability to understand that he was entitled to a lawyer if he wanted one.

The evidence will not support a finding that Mealey was "under heavy pressure" other than such pressure which might normally be incident to an arrest and reasonable police interrogation. Although Mealey had only a few hours sleep before he was arrested, a finding that he was suffering from "heavy fatigue" is not warranted.

When Mealey was interrogated, he appeared to understand each of his rights, and to be aware of his surroundings and what was going on. He was passive and cooperative, and in no degree challenging. He was not under the influence of liquor.

A Court never presumes acquiescence by a person in the loss of fundamental constitutional rights. Rather, it indulges every reasonable presumption against the waiver of such rights. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Nevertheless, on the basis of the State Court record and the testimony at the hearing before this Court, the Court finds that Mealey was competent to knowingly and intelligently waive both his right to remain silent and his right to an attorney, and that he did so.

This disposition of the waiver point makes it necessary to resolve the remaining question raised by the petitioner, namely, whether the photographic procedure utilized by the State to identify Mealey at trial was in violation of his due process rights under the Fourteenth Amendment and was not "harmless error."

During the trial the victim of the assault either could not or would not identify Mealey, who was in the court room. Thereafter, photographs of six men were exhibited to her by the prosecution. One strikingly differentiated Mealey from the other five.[1] From these photographs the victim identified Mealey as her assailant. The Delaware Supreme Court[2] held that this "procedure was error", but that:

> "[W]e think the error here was harmless beyond a reasonable doubt. Chap-

1. The Supreme Court stated that Mealey was depicted as a "white man" (State's Exhibit 7A), whereas the five others were "black men" (State's Exhibits 7B through F). Mealey appears to be a light complected negro or at least a non-Caucasian.

2. The Supreme Court of Delaware issued an unreported opinion in the proceedings below, Mealey v. State of Delaware, No. 183, 1970 (1971).

man v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although improper, the identification was merely cumulative to the State's already very strong case. We reach this conclusion because of the overwhelming evidence otherwise produced by the State connecting Mealey to the crime in question."

Later it said:

"We think unquestionably the State's case, irrespective of the identification of Mealey by the victim, conclusively connected him to the commission of the crime in question. The erroneous method of identification, therefore, could not have influenced the jury's verdict in view of the conclusiveness of the other evidence produced by the State to connect Mealey to the crime."

The United States Supreme Court in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) held that:

"convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

While the posture of the instant case differs from *Simmons* in that the victim identified Mealey from a photograph shown to her for the first time at the trial, there can be little doubt that the showing of the photographs was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Where this occurs, Fourteenth Amendment due process is violated. See, e. g., Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 2d 401 (1972); United States v. Milano, 443 F.2d 1022, 1025 (10th Cir.), cert. denied 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971).

It does not follow, however, that a reversal of a conviction is required in every case in which a constitutional right is infringed during the trial. Some invasions so unimportant and insignificant in the setting of a particular case may, consistent with the Constitution, be deemed harmless, and not to require an automatic reversal. On the other hand, some constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error. Chapman v. California, 386 U.S. 18, 22–23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[3] Into which of these two categories falls an impermissibly suggestive photographic identification has never been decided by the Supreme Court. It seems clear, however, that every impermissibly suggestive photographic identification does not call for automatic reversal. In several instances, lower federal courts first have made a determination that photographic identifications were impermissibly suggestive and then have looked to the harmless error doctrine to ascertain whether reversal was called for. See, e. g., United States v. Fried, 436 F.2d 784 (6th Cir.), cert. denied 403 U.S. 934, 91 S.Ct. 2264, 29 L.Ed.2d 714 (1971) (harmless error); Kimbrough v. Cox, 444 F.2d 8 (4th Cir. 1971) (not harmless error).

It is true that *Simmons* states that a conviction must be set aside if based upon eyewitness identification preceded by photographic identification procedure which is impermissibly suggestive. 390 U.S. at 384, 88 S.Ct. 967. This statement was made, however, in the context of a case in which the sole basis for identifying the defendant was the testimony claimed by the defense to be tainted. In the case at bar this was

3. Examples of such fundamental rights cited in Chapman v. California, 386 U.S. at 23 n. 8, 87 S.Ct. 824 are coerced confessions, Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); right to counsel, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and an impartial judge, Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

not true. The conviction here was obtained not only upon the improper identification testimony of the victim, but also upon substantial circumstantial evidence which pointed exclusively to Mealey. Admittedly, in any criminal trial identification of an accused is always a critical issue. California v. Green, 399 U.S. 149, 186 n. 20, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (concurring opinion). Circumstantial evidence, however, is sometimes more trustworthy than eyewitness testimony in identifying an accused. The record shows this to have been true in the present case. Under such circumstances the issue whether a verdict should stand or fall must depend upon whether the encroachment on the accused's constitutional rights constituted harmless error. *Simmons* never required a determination of the applicability of the harmless error rule, for the Court found that there was little chance that the procedure led to a misidentification of Simmons. 390 U.S. at 385, 88 S.Ct. 967.

Before a federal constitutional error can be held harmless, the Court must be able to declare a belief that it was harmless beyond a reasonable doubt. This turns upon whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. The burden of showing that a constitutional error is harmless rests with the Government. *Chapman, supra,* 386 U.S. at 23–24, 87 S.Ct. 824. Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. *Chapman* at 24, 87 S.Ct. 824; Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

In Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Court seemingly rejected the argument that a conviction based upon evidence admitted in violation of constitutional safeguards must be reversed if the Court could imagine that a single juror might have had his mind made up because of the evidence. Instead, the Court stated that the reviewing Court's judgment must be based on its own reading of the record and what seems to it to have been the probable impact of the illegally admitted evidence on the minds of an average jury. This was repeated in *Schneble, supra,* 405 U.S. at 432, 92 S.Ct. 1056. There the Court said that judicious application of the harmless error rule does not require the Court to indulge in assumptions of irrational jury behavior. The harmless error test, it said, requires a judicial balancing of the properly and improperly admitted evidence, and that if "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [illegally admitted evidence] is so insignificant by comparison," then the conclusion is warranted that the improperly admitted evidence was harmless error. *Schneble* at 430,[4] 92 S.Ct. at 1059.

To determine the weight which the average jury might possibly have given to the victim's photographic identification of Mealey, the manner and circumstances of her testimony must be examined.

The State called the victim to testify about her assault. On direct examination she said that she would know her

4. Mealey argues that the rationale of Chief Justice Traynor's dissenting opinion in People v. Ross, 67 Cal.2d 96, 60 Cal.Rptr. 254, 429 P.2d 606 (1967) supports the conclusion that the admission of the photographic identification was not harmless error. He points out that the California case was reversed, sub nom. Anderson v. Nelson, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968), and that the reversal was tantamount to an affirmance by the Supreme Court of Chief Justice Traynor's views. It is unnecessary to analyze Chief Justice Traynor's opinion. Nothing in Anderson v. Nelson suggests that the U. S. Supreme Court agreed with or adopted the principles espoused by Chief Justice Traynor. Anderson v. Nelson ante-dated *Harrington*, *Schneble* and Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). These opinions must be construed as the latest words of the Supreme Court on the subject of harmless error.

assailant if she saw him again. When asked whether she saw anyone in the court room who looked like him she would not say that she did. Instead she said that she didn't "know where to look, there's so many [in the court room]", that she left her glasses at home, and that she was "afraid of him". When this testimony was given, and presumably thereafter, the victim's chair had been placed three feet away and directly in front of Mealey.[5] Questioned further by the State, she repeated that if she saw him she thought she would know him, but when she was asked if he was in the court room she said, "he ain't in here, is he?"

Thereafter, the Court recessed for luncheon. When it reconvened the State showed her six photographs. She said one, which she pointed to, looked like the man who attacked her.[6] This was a photograph of Mealey.[7] On cross examination she was asked whether the person who attacked her was "a white man or a black man." She replied, "He looked like a white man, to me." On redirect examination by the State she said that by a "white man" she meant "he was light-complected", that "he wasn't black" and that "[h]e kind of had a red complection [sic] on him."

The Delaware Supreme Court discounted the importance of this testimony by stating that the victim was a very elderly, nearsighted woman and that it was apparent from the transcript that she was confused and afraid of Mealey. Whether this was the true reason for her failure to identify him or whether in reality it was because she was unable to do so is a matter upon which jury members might well have disagreed. In any event, her testimony was unquestionably confused, uncertain, and after twice having refused to recognize Mealey in the court room, was of doubtful persuasiveness. Even the State recognized the relative unimportance of the victim's testimony for it referred to it only cursorily in its opening summation and not at all in its rebuttal. What the State did emphasize to the jury was the circumstantial evidence of Mealey's guilt. This latter evidence, beyond any question, pointed to Mealey as the guilty party.

The victim testified that at 3:00 a. m. when she was attacked her assailant had a portable radio with him.[8] Sanders, one of Mealey's friends, testified that he let Mealey and another boy out of his car in the Richardson Park area between 12:15 and 12:30 a. m. on the morning of the crime and that after he did so his portable radio was missing.[9] Steen, a night-shift employee of a neighborhood oil company, testified that he saw Mealey at 3:00 to 3:30 a. m. and he was then carrying a portable radio.[10] Finally, Mealey's mother testified that when he returned home at 3:45 a. m.[11] he was then carrying a portable radio.[12] This multi-witness radio testimony tended to identify Mealey as the rapist.

The testimony concerning Mealey's clothing on the night in question is also

5. Undenied statements made at side bar by Balick, her attorney, during trial.

6. Before finally selecting Mealey's photograph, the victim seemingly identified one, and perhaps two other individuals as resembling her assailant:

"Q Now I am going to show you six pictures, and I want to see if you can recognize anybody in those pictures.
A This looks like him, the fat one.
Q Have you looked at them all now?
A This looks just like him.
Q I want you to look at all the pictures before you make the selection.
A Well, that looks like him, too.
MR. BALICK: Excuse me, but could we note for the record that the first one Miss Sanderson said looks like him, which was the first one that she said.
THE WITNESS: That looks like him, too, but that does look like him."

7. See pp. 6–7 of State's Closing Argument.

8. Tr 9.

9. Tr 158.

10. Tr 41.

11. Tr 178.

12. Tr 180.

relevant to his involvement. The victim stated that her assailant wore black pants.[13] Buckman, a neighborhood resident, testified she saw Mealey at 2:45 a. m. and he was then wearing black pants.[14] Steen, the night-shift employee, testified that when he saw Mealey at 3:00–3:30 a. m. he was wearing dark pants.[15] Mealey's mother testified that when he came home at 3:45 a. m. he was wearing dark pants.[16] Finally, when the police questioned Mealey at the police station shortly after his arrest, he was wearing black gabardine trousers.[17]

The cigarette lighter evidence likewise tended to incriminate Mealey. Mealey admitted to the police that he had broken into a delicatessen within three blocks of the scene of the crime prior to 3:00 a. m. on the morning in question and took eight plastic view cigarette lighters and two watches.[18] The police found four plastic view lighters in the bedroom of the victim.[19] The arresting officers found a similar plastic view lighter in Mealey's pocket when he was arrested.[20] Mealey admitted to the police that the lighters which he took from the delicatessen were like the one taken from his pocket,[21] and that the lighter taken from his pocket was his.[22]

Mealey admitted to the police that he owned a British shilling with a hole in it, that he had had it with him on the night in question, and that the shilling found outside the victim's house was in fact his.[23] The investigating officers found two copies of a motor vehicle warrant bearing Mealey's name in the victim's bedroom.[24]

At the police station Detective Dale searched the surface of Mealey's trousers and found three or four gray hairs about a foot in length.[25] Asked to drop his pants, Detective Dale testified that Mealey's white undershorts were stained with a reddish substance which appeared to be blood.[26]

From its reading of the record, the Court has attempted to assess the probable impact of the illegally admitted evidence on the minds of an average jury. In doing so it has not assumed an irrational jury. Nor has it attempted to speculate on how the evidence might have affected any single juror. Upon the basis of this approach, the Court finds that the properly admitted evidence of Mealey's guilt was so overwhelming, and the prejudicial effect of the victim's identification of him was so insignificant by comparison that it is not reasonably possible that the improperly admitted evidence contributed to his conviction. This conclusion is based upon an evaluation of the entire record and

13. Tr 27.
14. Tr 190–91, 196.
15. Tr 41.
16. Tr 179.
17. Tr 111.
18. Tr 109–110.
19. Tr 47.
20. Tr 101.
21. Tr 110.
22. Tr 111.
23. Tr 110.
24. Tr 47, 54.
25. Tr 111.
26. Some evidence did tend to exculpate Mealey. Although the victim testified that her assailant had broken in at 3:00 a. m. and stayed to 5:00 a. m. (Tr 20, 27), Mealey's mother and Steen placed him elsewhere during a portion of that period (Tr 41, 178). Officer Hedrick testified that he found a pair of shoes outside the victim's window (Tr 49). Again, Mealey's mother and Steen testified that they saw Mealey wearing shoes during a part of the period when the victim claims he was in her house (Tr 41, 178). The weight of this testimony was minimal, especially in view of the interest of Mealey's mother. It is highly unlikely that it could have created a reasonable doubt of Mealey's guilt in the minds of an average jury.

has not been reached simply because the illegal evidence was merely cumulative of the legally admitted evidence of guilt. *cf.* Harrington v. California, *supra,* 395 U.S. at 254, 89 S.Ct. 1726.

The admission of the victim's testimony which identified Mealey from the photographs constituted harmless error.

The petition for a writ of habeas corpus will be dismissed.

## APPENDIX

9:30 AM.
Det. Lanctonda

NEW CASTLE COUNTY
POLICE DEPARTMENT

RIGHTS FORM

WE HAVE A DUTY TO EXPLAIN TO YOU AND TO WARN YOU THAT YOU HAVE THE FOLLOWING LEGAL RIGHTS: DO YOU UNDERSTAND? — MCL. yes RDM

YOU HAVE A RIGHT TO REMAIN SILENT AND DO NOT HAVE TO SAY ANYTHING UNLESS YOU CHOOSE TO DO SO. DO YOU UNDERSTAND? — MCL. yes RDM

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT. DO YOU UNDERSTAND? — MCL. yes RDM

YOU HAVE A RIGHT TO TALK TO A LAWYER OF YOUR OWN CHOICE BEFORE WE ASK YOU ANY QUESTIONS, AND ALSO TO HAVE A LAWYER HERE WITH YOU WHILE WE ASK QUESTIONS. DO YOU UNDERSTAND? — MCL. yes RDM

IF YOU CANNOT AFFORD TO HIRE A LAWYER AND YOU WANT ONE WE WILL SEE THAT YOU HAVE A LAWYER PROVIDED TO YOU, BEFORE WE ASK YOU ANY QUESTIONS. DO YOU UNDERSTAND? — MCL yes RDM

DO YOU WANT TO EITHER TALK WITH A LAWYER AT THIS TIME, OR TO HAVE A LAWYER WITH YOU WHILE WE ASK YOU QUESTIONS. DO YOU UNDERSTAND? — MCL yes RDM

IF YOU ARE WILLING TO GIVE US A STATEMENT, YOU HAVE A RIGHT TO STOP ANY TIME YOU WISH. DO YOU UNDERSTAND? — MCL yes RDM

ARE YOU WILLING TO ANSWER QUESTIONS OF YOUR OWN FREE WILL WITHOUT FORCE OR FEAR AND WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO YOU. DO YOU UNDERSTAND? — MCL yes RDM

DO YOU NOW UNDERSTAND ALL OF YOUR RIGHTS WHICH WE HAVE JUST EXPLAINED? — MCL yes RDM

WITH THESE RIGHTS IN MIND, ARE YOU WILLING TO TALK TO US WITHOUT A LAWYER TO REPRESENT YOU? — MCL yes RDM

WITNESSES:
Detective Michael C. Lanctonda 26
Detective John R. McCarran 12
Ptl Sgt Frank Costello

SIGNATURE X Russell D Mealey Jr
ADDRESS 25 Louise Road
DATE/TIME 9/17/69 9:35 AM