**UNITED STATES of America ex rel.
Russell Davis MEALEY, Jr.,
Appellant,**

v.

**The STATE OF DELAWARE.**

**No. 73-1412.**

United States Court of Appeals,
Third Circuit.

Submitted Oct. 29, 1973.

Decided Jan. 2, 1974.

See also, D.C., 352 F.Supp. 349.

Richard W. Pell, Tybout, Redfearn & Schnee, Wilmington, Del., for appellant.

Francis A. Reardon, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for appellee.

Before HASTIE, ALDISERT and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal presents the question whether impermissible photographic identification testimony which infringed appellant's due process rights in a state criminal proceeding constituted harmless error beyond a reasonable doubt. The district court found "that the properly admitted evidence of Mealey's guilt was so overwhelming, and the prejudicial effect of the victim's identification of him was so insignificant by comparison that it is not reasonably possible that the im-

properly admitted evidence contributed to his conviction." [1]

Following a jury trial in a Delaware State Court, Mealey was convicted on the charge of raping a seventy-six year old woman, and because the jury did not recommend mercy, he was given a life sentence as required by Delaware law, 11 Del.Code Ann. § 781.[2] The conviction was affirmed by the Delaware Supreme Court in an unreported opinion in Mealey v. State of Delaware, No. 183, 1970 (1971). Thereafter appellant petitioned the district court for a writ of habeas corpus. An evidentiary hearing was held; the district court denied relief; and this appeal followed.

The relevant legal and constitutional principles are not in dispute. The sole question is the application of those principles to the evidence adduced at trial. This evidence disclosed that Mealey had a comprehension in reading, spelling and arithmetic between the second and third grade, in the opinion of a psychologist, "a mentally defective range" for a twenty year old. On September 17, 1969, he was with a group of other youths drinking and carousing in the vicinity of the residence of Mrs. Viola Sanderson, the victim. There was testimony that Mealey had drunk three six packs of beer and a fifth of whiskey in the twelve hours preceding the incident.

At approximately 3:00 a. m. Mrs. Sanderson was beaten and raped in her home by an assailant who had gained entry through a previously broken window. A neighbor testified that at 2:45 a. m. she "heard all this commotion" and saw the appellant and three other youths "Luther Payne, Larry Blevins,

Richard Morgan (the victim's son), they were all out in front of this house. . . . " "From my house, see, I can't see Mrs. Sanderson's entrance or anything of her property and it's tall weeds there to the side . . . they were kind of wrestling around, you know, and loud talking. And then all four of them went in Mrs. Grants' (a neighbor of the victim) house."

We agree with the Delaware Supreme Court and the district court that the state had a "strong case" of circumstantial evidence connecting Mealey to the crime: the victim testified that her assailant had a portable radio; witness Sanders testified that he owned a portable radio and had possession of it that evening when Mealey and another entered his car, and that after they left his car between 11:30 p. m. and 12:30 a. m., his radio was missing; Mealey was seen at a time between 3:00 and 3:30 a. m. with a portable radio; his mother testified that upon his return home at 3:45 a. m. he was carrying a portable radio. The victim said the assailant wore black trousers; separate witnesses saw Mealey wearing black trousers at 2:45 and between 3:00 and 3:30 a. m. as did his mother when he returned home; and at the time of police questioning, Mealey was wearing black gabardine trousers.

Following interrogation by the police, Mealey admitted he had broken into a neighborhood delicatessen, stealing eight plastic lighters and two watches and that he was the owner of a British shilling coin with a hole in it.[3] The police found a British shilling with a hole in it outside the victim's house.

1. United States ex rel. Mealey v. Delaware, 356 F.Supp. 473 (D.Del.1973).

2. Mealey was also convicted of breaking and entering under 11 Del.Code Ann. § 397 and sentenced to a concurrent term of three years imprisonment.

3. Pursuant to an opinion reported in 352 F. Supp. 349 (D.Del.1972), the district court held an evidentiary hearing on the issue of appellant's waiver of rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966). Thereafter, in its opinion reported in 356 F.Supp. 473, 477 (D. Del.1973), the district court found that "[o]n the basis of the State Court record and the testimony at the hearing before . . . [it] . . . Mealey was competent to knowingly and intelligently waive both his right to remain silent and his right to an attorney, and that he did so." For the reasons set forth in the district court's opinion, 356 F.Supp. 473, 475–477, we will not disturb this finding.

In the victim's bedroom the police found four plastic cigarette lighters and two copies of a motor vehicle warrant bearing Mealey's name.

The state offered evidence that police found three or four grey hairs about a foot in length on Mealey's trousers. There was no proof of similarity between the victim's hair and the hairs found on Mealey. Police found that Mealey's white undershorts were stained with a reddish substance. There was no proof that the stains were blood.

We now turn to the identification evidence as described by the habeas court:

> During the trial the victim of the assault either could not or would not identify Mealey, who was in the courtroom. Thereafter, photographs of six men were exhibited to her by the prosecution. One strikingly differentiated Mealey from the other five.[4] From these photographs the victim identified Mealey as her assailant.[5] The Delaware Supreme Court held that this "procedure was error," but that:

> "[W]e think the error here was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). Although improper, the identification was merely cumulative of the State's already very strong case. We reach this conclusion because of the over-whelming evidence otherwise produced by the State connecting Mealey to the crime in question."

356 F.Supp. at 477–478.

█ The district court found the photographic identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), but agreed with the Delaware court that the introduction of this evidence was harmless error, relying upon three Supreme Court cases: *Chapman, supra*; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In all three of these cases the Supreme Court had to determine whether constitutional error was harmless.[6]

In *Chapman, supra*, the Court held that "before a federal constitutional error can be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828. In *Harrington, supra*, the Court concluded that its judgment on the existence *vel non* of harmless constitutional error would be based on its own reading of the record and on what seemed to it to have been the probable impact of the improper evidence on the jury. Schneble v. Florida,

---

4. The Delaware Supreme Court stated that Mealey was depicted as a white man; the five others were "black men." The district court stated "Mealey appears to be a light complected Negro or at least a non-Caucasian." 356 F.Supp. at 477 n.1.

5. At trial Mrs. Sanderson identified at least one and possibly two other photographs as resembling her assailant before selecting Mealey's photograph. Mealey's photograph became state's exhibit 7A and was referred to by the state in its closing arguments.

Mrs. Sanderson was also asked if her assailant was in the courtroom. Her wheelchair was placed directly in front of the defendant and she was unable to identify him. The court stated, "See if she can make identification by asking her again."

Q. This person, if you saw him, would you know him?

A. Yes, I think I would know him.

Q. Do you know if he is in the courtroom?

A. I don't know. I didn't—he ain't in here, is he?

Although there was discussion about obtaining a pair of glasses for her, the prosecution did not follow through with its third attempt at courtroom identification. The court later observed: "She was never asked when she got her glasses if she could make another identification."

6. Since Mealey contends that his right to due process of law was violated by this identification procedure, the federal, not state, harmless error rule is applicable. *See Chapman, supra*, 386 U.S. at 21, 87 S.Ct. 824.

405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, instructs us to balance the evidence properly admitted against that improperly admitted; and that if "the properly admitted evidence of guilt is so overwhelming, and the prejudical effect of the [improperly admitted evidence] is so insignificant by comparison," then the conclusion is warranted that the improperly admitted evidence was harmless error. *See,* Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

■ Based upon our review of the record, we are persuaded that there was sufficient circumstantial evidence to establish Mealey's presence in the victim's house, if not her bedroom, sometime on the night of the crime. However, part of this same evidence placed Mealey, not alone, but with three friends, including the victim's son, in the vicinity of the victim's house only fifteen minutes before the rape. Mrs. Buckman, the witness who saw and heard this group, was certain of the time because she "looked at . . . [her] cuckoo clock on the wall." [7]

Moreover, the only specific evidence that ties Mealey to the crime of rape is (1) he wore black trousers, (2) he had reddish stains on his undershorts, and (3) he had three or four grey hairs on his trousers. There was no proof that Mealey was the only one of the four youths wearing black pants.[8] There was no proof that his undershorts bore the victim's blood or that the specific grey hairs found on his person were of like substance, texture, color and length of the victim's hair.[9]

This is not to say that the accumulation of this evidence would not have supported a verdict of rape under Delaware law. It is to say, however, that the judiciary must be scrupulous in evaluating the probable impact of the identification testimony on the jury's decisions (1) to return a verdict of guilty, and (2) not to recommend mercy, which mandates a life sentence under Delaware law.

"The vagaries of eyewitness testimony are well-known. . . ." [10] We have previously recorded the observation that "the major cause of wrongful convictions is not the use of confessions, but the use of eye-witness identifications," [11] and have said:

> Eye-witness identification testimony . . . is an expression of a belief or impression by the witness. If there is a high degree of precision and certainty in his expression, which is consistent with any prior statements and unshaken on cross-examination, the statement of the witness may be regarded as a statement of fact. If certainty is lacking, the expression

7. Although Mrs. Sanderson testified that her assailant came into the bedroom "by himself," this does not inexorably lead to the conclusion that this assailant was Mealey. In addition to problems of identification in the courtroom, she had difficulties in describing what she saw that night. For example, Mrs. Sanderson initially testified that she did not see anything in her assailant's hand. Yet, she later testified that he had a portable radio. The importance of the portable radio testimony has already been emphasized.

8. Mrs. Buckman, the witness who had seen the group at 2:45 a. m., was among those who testified that Mealey wore dark pants. However, she was able to describe only the shirt (white) of one of the other three youths and she was unable to describe in any way the attire of the remaining two.

9. Neither the hairs nor the shorts were introduced into evidence; instead, detectives testified that these matters were on the defendant's person when he was searched at police headquarters. It also appears that these items were not submitted for scientific testing, although one detective admitted that such tests could have been performed.

10. United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967).

11. United States v. Barber, 442 F.2d 517, 526 n.9, citing The Dimensions of Eyewitness Identification Cases, 42 U.Colo.L.Rev. 135 (1970).

5

is deemed to possess an evidentiary quality of inferior rank.[15]

15. Opinion of any kind is a poor quality of evidence, and where admissible at all it is only so because it is the best that is available.

United States v. Barber, *supra*, 442 F.2d at 527.

The same considerations which impelled our grave concern for jury instructions on eye-witness identification must not be minimized nor neglected when we balance proper circumstantial evidence and improper identification evidence in the determination of harmless error presented in constitutional issues.

It is to ignore, if not to defy, the probabilities of human experience if we fail to appreciate that jurors are appalled at the recitation of clinical details of sexual attacks from the lips of victims. Any of us, possessed with the most elemental feelings of sensitivity, has a natural desire to extend sympathetic attention to innocent victims of such heinous crimes; consequently, there is a concomitant tendency to place great reliance upon the victim's description of details of the attack. Such inclinations are but symptomatic of predictable normal human behavior.

We do not suggest that there be a diminution of the value of such eye-witness accounts or of the respect to be accorded such testimony. Consideration of properly admitted direct evidence, tested in the crucible of the adversary process in open court, is the one great organon of the factfinder in its quest for the truth. But the very respectability of such direct evidence, especially identification testimony proffered by the victim of a heinous crime, requires that safeguards be interposed so that such evidence does not completely inundate and engulf other competent, relevant, and material items of evidence which compete for the factfinder's attention.

Thus, we have established rules of evidence—some imposed by substantive law, others mandated by the Constitution—that evidence not only be relevant and material, but also competent. Two distinguished courts, the Delaware Supreme Court and the United States District Court for that state, have ruled that the testimony of the victim identifying her assailant did not meet the federal constitutional test of competency. But sound principles of justice do not stop with that determination. Roscoe Pound would remind us that we are not bound by principles of mechanical jurisprudence: "The sociological movement in jurispurdence is a movement for pragmatism as a philosophy of law; for the adjustment of principles and doctrines to human conditions they are to govern rather than to assumed first principles; for putting the human factor in the central place and relegating logic to its true position as an instrument." [12]

Accordingly, the Supreme Court has ruled that the mere fact that illegal evidence has been admitted does not necessarily infect the entire proceedings, *Schneble, supra*, and that if a court can determine that "the prejudicial effect of it is insignificant by comparison" with other properly admitted evidence, then we should not disturb the verdict.

Admittedly, striking this balance is a subjective judgment. Admittedly this requires us, in Pound's phrase, to put "the human factor in the central place."

So guided, we find that we cannot, as a matter of law, say that the Delaware jury in this case, composed of a reasonable cross section of the community, representative of the vicinage, possessed of all the sensibilities, compassion and sympathetic understanding of the plight of the elderly victim of a henious sexual assault, did not place undue importance on her identification testimony. We cannot say that the dramatic eye-witness testimony was "so insignificant by comparison" as to call into play the harmless er-

12. Pound, Mechanical Jurisprudence, 8 Colo.L.Rev. 605, 609–10 (1908).

ror rule.[13] So balancing the evidence, we conclude that "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. . . ."[14]

The judgment of the district court will be reversed, and the proceedings remanded with a direction to grant the writ of habeas corpus unless the State of Delaware, within a reasonable time, grants a new trial on the indictment.

See also, 338 F.Supp. 1176.

---

13. This is especially true since the victim was in a wheelchair at trial and testified that she was "beat up so much" she was unable to see out of one eye.

14. *Schneble, supra,* 405 U.S. at 432, 92 S.Ct. at 1060.