# MILTON *v.* WAINWRIGHT, CORRECTIONS DIRECTOR

No. 70–5012.   Argued January 12, 1972—Decided June 22, 1972

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined, *post*, p. 378.

*Neil P. Rutledge,* by appointment of the Court, 403 U. S. 951, argued the cause and filed a brief for petitioner.

*J. Robert Olian,* Assistant Attorney General of Florida, argued the cause for respondent *pro hac vice.* With him on the brief was *Robert L. Shevin,* Attorney General.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ of certiorari on claims under the Fifth and Sixth Amendments arising out of the use of one of a number of confessions, all of which were received in evidence over objection. The confession challenged here was obtained by a police officer posing as an accused person confined in the cell with petitioner.

Petitioner Milton is presently serving a life sentence imposed in 1958 upon his conviction of first-degree murder following a jury trial in Dade County, Florida. During that trial, the State called as a witness a police officer who, at a time when petitioner had already been indicted and was represented by counsel, posed as a fellow prisoner and spent almost two full days sharing a cell with petitioner. The officer testified to incriminating statements made to him by petitioner during this period. Contending that the statements he made to the officer were involuntary under Fifth Amendment standards and were obtained in violation of his Sixth Amendment rights as subsequently interpreted in *Massiah* v. *United States,* 377 U. S. 201 (1964), petitioner initiated the present habeas corpus proceeding in the United States District Court for the Southern District of Florida. The District Court, finding that petitioner had exhausted his state remedies in the course of several post-conviction proceedings in the Florida courts, ruled against petitioner on the merits of his claim, holding that his statements to the police officer were not inadmissible on Fifth Amendment grounds and that his Sixth Amendment claim could not prevail since "[n]o Court has declared *Massiah* retroactive, and this Court will not be the first to do so." 306 F. Supp. 929, 933. The Court of Appeals affirmed the denial of relief to petitioner, 428 F. 2d 463.

On the basis of the argument in the case and our examination of the extensive record of petitioner's 1958 trial, we have concluded that the judgment under review must be affirmed without reaching the merits of petitioner's present claim. Assuming, *arguendo,* that the challenged testimony should have been excluded, the record clearly reveals that any error in its admission was harmless beyond a reasonable doubt. *Harrington* v. *California,* 395 U. S. 250 (1969); *Chapman* v. *California,* 386 U. S. 18 (1967). The jury, in addition to hearing the challenged

testimony, was presented with overwhelming evidence of petitioner's guilt, including no less than three full confessions that were made by petitioner prior to his indictment. Those confessions have been found admissible in the course of previous post-conviction proceedings brought by petitioner in his attempts to have this conviction set aside, and they are not challenged here.

The crime for which petitioner was convicted occurred in the early morning hours of June 1, 1958. The woman with whom petitioner had been living was asleep while riding as a passenger in the rear seat of an automobile driven by petitioner; she died by drowning when the car ran into the Miami River with its rear windows closed and its rear doors securely locked from the outside with safety devices designed to ensure against accidental opening of the doors. Petitioner, who jumped from the car shortly before it reached the water, was nevertheless propelled into the river by the car's momentum; he was recovered from the water when a seaman nearby heard his cries for help and found him clinging to a boat moored in the river near the point of the automobile's entry. A few hours later the car, with the victim's body still inside, was retrieved from the bottom of the river a short distance downstream from its point of entry.

The following day the Miami police arrested petitioner on manslaughter charges and placed him in the city jail. Ten days after the woman's death, petitioner, having been advised of his right to remain silent, confessed that he had deliberately killed the woman and that the accident was simulated. He first made an oral confession to a police officer during a question-and-answer exchange that was preserved on a wire-recording device. He then repeated his confession during another exchange and these statements were taken down by a stenographer; after this stenographic recording was converted to a transcript, peti-

tioner read it over in full and signed it at 11 p. m. on June 11.[1]

The following day, petitioner told a police officer that he would like to make some clarifying additions to the statements in the writing he had signed the previous night. The officer suggested that they first go with a photographer to the scene of the incident "and reconstruct how this thing . . . occurred." Petitioner agreed. He, the police officer, and a photographer then went to the scene of the crime where petitioner pointed out the route he had taken in driving the car to the river, the approximate point at which he had jumped out of the car, and the point of the car's entry into the river. Petitioner was then taken back to the police station where he went over his statement of the night before and indicated to the officer the parts of that statement he wanted to clarify. Once again, a stenographer was summoned and a question-and-answer exchange was taken down and transcribed to a writing that petitioner read over and signed.[2]

---

[1] In this first written confession, petitioner made the following statements:

"Minnie Lee Claybon [the murder victim] and myself had an insurance policy together. So I started thinking about the insurance and the money that I could get if something happened to her. I knew that I could use the money if something happened. So I decided to do something about it one way or the other, so one night we had been riding around in the car. So I decided to get the whole thing over with. So I drived the car into the river and she was killed.

". . . I drove the car straight toward the river, and just as I got almost to the river, . . . I jumped from the car and the car went on into the river and I skidded and kept rolling over and over until I was in the river also. I hurt my shoulder. I couldn't move that arm. It was hurting real bad."

[2] In this second writing, petitioner confirmed in major part the statements he had made the night before, but said in addition that he had "decided to kill" the woman "about a month before this

Approximately one week after he had made these confessions, petitioner secured the services of an attorney who advised him not to engage in any further discussions of his case with anyone else.

Following this, and while petitioner was under indictment and confined in the Dade County jail awaiting trial, the State, for reasons that are not altogether clear, assigned a police officer named Langford the special detail of posing as a prisoner and sharing petitioner's cell in order to "seek information" from him.

Langford entered the cell with petitioner late one Friday afternoon and presented himself as a fellow prisoner under investigation for murder; he assumed a friendly pose toward his cellmate, offering petitioner some of his prison food at their first breakfast together the next morning and telling petitioner something of his own fictitious "crime," which he described as a robbery committed with an accomplice who had used Langford's gun to kill the robbery victim. Finally, petitioner began to boast that he had not made Langford's mistake of having an accomplice who might later serve as a witness; instead, he said, he had committed the "perfect" crime with no surviving witnesses. By the time Langford left the cell on Sunday afternoon, petitioner had described his own crime in some detail and had predicted with much assurance that he would soon be released, that he would collect a lot of insurance money, and that he would then flee the State with the insurance money without ever being brought to trial for his "perfect" crime. The incriminating statements made to Langford were essentially the

incident happened." He further stated, however, that he was not thinking of the insurance money when he made that decision, but was thinking instead of the woman's habits of associating with other men, drinking too much, and staying out late at night. He reaffirmed in express terms that he, had deliberately driven the car into the river with the intention of killing the woman.

same as those given in the prior confessions not challenged here.

At petitioner's trial in state court, the wire recording of his first confession was played back, first to the judge for a ruling on its admissibility, and then to the jury. Petitioner's two written confessions were also received in evidence, as were the photographs that were taken and the statements that were made by petitioner when he reconstructed the crime at the scene of its occurrence. In addition, Langford was permitted to testify to the statements made to him by petitioner while the two men were sharing the cell in the county jail. Other evidence, highly damaging to petitioner in its totality, was also presented to the jury. For example, there was testimony that petitioner had told an acquaintance a few months before the murder that he disliked Minnie Claybon (the murder victim) and was interested only in getting some money out of her. The terms of certain insurance policies purchased by petitioner about two months before the crime were described in testimony given by the selling insurance agents; the policies provided for the payment of $8,500 to petitioner upon the accidental death of Miss Claybon, and the agents testified that petitioner had faithfully maintained his weekly premium payments on the policies. Other testimony, however, indicated that petitioner was hard pressed for money shortly before the murder, having fallen behind in his rent payments and having sold some of his personal clothing to raise small sums. There was testimony that petitioner had purchased the car in which Miss Claybon drowned on the very afternoon before the crime, making a cash down payment of $8; that the safety devices on the rear doors of the car had been left in the unlocked position by the car's former owner; that these devices could be put in the locked position only by loosening a screw, sliding the

locking device into position, and then retightening the screw; and that these devices were found securely screwed in the locked position when the car, with the victim's body still inside, was recovered from the river. After hearing all the evidence, the jury found petitioner guilty of murder in the first degree, but recommended mercy; on that recommendation, the trial judge imposed the sentence of life imprisonment.

The petitioner has made a number of collateral attacks on his conviction, primarily in the courts of Florida. In response to one of his applications for post-conviction relief, the Florida Supreme Court issued a writ of habeas corpus, heard oral argument on the voluntariness of petitioner's wire-recorded and written confessions, but thereafter discharged the writ in a reported decision upholding the voluntariness of those confessions and their admissibility at trial. *Milton* v. *Cochran*, 147 So. 2d 137 (1962), cert. denied, 375 U. S. 869 (1963). The issues raised in that proceeding are not now before us and must, for the purposes of the instant case, be treated as having been properly resolved by the Florida Supreme Court. Cf. Sup. Ct. Rule 23 (1)(c).

In initiating the present habeas corpus proceeding in the District Court, petitioner sought to have his conviction set aside on the ground that the statements he made to police officer Langford should not have been admitted against him. Our review of the record, however, leaves us with no reasonable doubt that the jury at petitioner's 1958 trial would have reached the same verdict without hearing Langford's testimony. The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo* but, rather, to review for violation of federal constitutional standards. In that process we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court 14

years ago by use of evidence not challenged here; the use of the additional evidence challenged in this proceeding and arguably open to challenge was, beyond reasonable doubt, harmless.

*Affirmed.*

Mr. Justice Stewart, with whom Mr. Justice Douglas, Mr. Justice Brennan, and Mr. Justice Marshall join, dissenting.

Under the guise of finding "harmless error," the Court today turns its back on a landmark constitutional precedent established 40 years ago. That precedent, which clearly controls this case, is *Powell* v. *Alabama,* 287 U. S. 45. I respectfully dissent.

In 1958 a Florida grand jury indicted the petitioner, George Milton, for first-degree murder. This was an offense punishable by death under Florida law. After he had been indicted, Milton was remanded to the Dade County jail to await trial. He had retained a lawyer, who had advised him not to talk about his case with anyone.

Some two weeks later the State directed a police officer named Langford to enter Milton's cell, posing as a fellow prisoner also under indictment for murder, in order to "seek information" from Milton. Langford entered the cell on a Friday evening. That night he "tried to open him [Milton] up," but Milton refused to talk about his case. The next day Langford devoted his efforts to gaining Milton's confidence. He shared his breakfast with Milton and gave him candy. He talked convincingly about his own purported crime. He tried to steer the conversation to the charge against Milton, but Milton repeatedly said he did not want to talk about it, and had been told not to talk about it by his lawyer. Finally, sometime between midnight and 3 a. m. on Sunday, after almost 36 hours of prodding

by his supposed fellow prisoner, Milton allegedly confessed the murder to Langford.

At Milton's subsequent trial, Langford, over objection, was allowed to testify in detail to this alleged confession. Milton was convicted, and, upon the recommendation of the jury, he was not sentenced to death, but to life imprisonment. His appeals to the state appellate courts were unavailing, and he ultimately filed the present federal habeas corpus proceeding in the United States District Court for the Southern District of Florida, claiming that his conviction was invalid because he had been deprived of his constitutional right to the assistance of counsel after the indictment.

The District Judge denied the writ, apparently believing that the question before him was whether this Court's decision in *Massiah v. United States,* 377 U. S. 201, was "retroactive":

> "This case was tried six years before the Supreme Court indicated in *Massiah v. United States,* 377 U. S. 201 . . . (1964), that confessions are involuntary *per se* if induced by officers or their agents from an accused after his indictment while he is without assistance of counsel. No Court has declared *Massiah* retroactive, and this Court will not be the first to do so. Counsel for Milton argues that *Massiah* was not declared retroactive because far from stating new principles of law, it merely restated principles derived from Powell v. Alabama, 287 U. S. 45 . . . (1932). However, the *Powell* case dealt with the Sixth Amendment right to appointment of counsel in a capital case, a situation far different from this case. Milton knew what he was doing. He wasn't intimidated by the police, because he didn't even know his cellmate was a policeman. He had a lawyer who had told him not to make any statements concerning

his case, but he chose not to follow that advice." 306 F. Supp. 929, 933–934.

The Court of Appeals for the Fifth Circuit affirmed *per curiam* "on the basis of [the District Court's] opinion," 428 F. 2d 463, and we granted certiorari, 403 U. S. 904.

The District Court and the Court of Appeals were in error. They were mistaken, first, in thinking that the *Massiah* case had anything to do with the "voluntariness" of a confession. They were mistaken, second, in thinking that any real question of "retroactivity" was presented. They were mistaken, third, in thinking that *Powell* v. *Alabama, supra,* dealt only with "appointment of counsel in a capital case." And they were mistaken, fourth, in thinking that *Powell* v. *Alabama* was inapplicable to this case.

*Powell* v. *Alabama,* decided almost 40 years ago, was one of the truly landmark constitutional decisions of this Court. It held that under the Fourteenth Amendment a man indicted for a capital offense in a state court has an absolute right, not "to appointment of," but to the *assistance* of counsel. And that constitutional right is not restricted to the trial. The Court reversed the convictions in *Powell,* because:

> "during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself." 287 U. S., at 57.

In *Massiah* v. *United States, supra,* we found that

this constitutional right to counsel [1] was violated when, after indictment, a defendant who had a lawyer was surreptitiously interrogated alone by an agent of the police. "[U]nder our system of justice," we said, "the most elemental concepts of due process of law contemplate that an indictment be followed by a trial, 'in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law.' . . ." "[A] Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. . . ." "This view," we said, "no more than reflects a constitutional principle established as long ago as *Powell* v. *Alabama,* 287 U. S. 45." 377 U. S., at 204–205.

The "retroactivity" of the *Massiah* decision is a wholly spurious issue. For *Massiah* marked no new departure in the law. It upset no accepted prosecutorial practice. Its "retroactivity" would effect no wholesale jail deliveries. Cf. *Tehan* v. *Shott,* 382 U. S. 406, 418–419. In no case before *Massiah* had this Court, at least since *Powell* v. *Alabama,* ever countenanced the kind of postindictment police interrogation there involved, let alone ever specifically upheld the constitutionality of any such interrogation.[2]

---

[1] *Massiah* involved a federal noncapital felony charge, where the defendant had an absolute Sixth Amendment right to counsel under *Johnson* v. *Zerbst,* 304 U. S. 458. The same absolute right was secured by *Gideon* v. *Wainwright,* 372 U. S. 335, to defendants in noncapital state criminal cases under the Sixth and Fourteenth Amendments. This constitutional guarantee has now been further extended. See *Argersinger* v. *Hamlin, ante,* p. 25.

[2] An issue of the "retroactivity" of a decision of this Court is not even presented unless the decision in question marks a sharp break in the web of the law. The issue is presented only when the de-

For four decades this Court has recognized that when a State indicts a man for a capital offense, the most rudimentary constitutional principles require that he be afforded the full and effective assistance of counsel:

> "Let it be emphasized at the outset that this is not a case where the police were questioning a suspect in the course of investigating an unsolved crime. . . .

> "Under our system of justice an indictment is supposed to be followed by an arraignment and a trial. At every stage in those proceedings the accused has an absolute right to a lawyer's help if the case is one in which a death sentence may be imposed. *Powell* v. *Alabama.*" *Spano* v. *New York,* 360 U. S. 315, 327 (concurring opinion).

So the question in this case is not whether *Massiah* is "retroactive," [3] for the rule in that case has been settled law ever since *Powell* v. *Alabama.*

I can find no basis for the Court's holding today that the admission of Officer Langford's testimony was harmless. In *Chapman* v. *California,* 386 U. S. 18, we said that an "error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant

---

cision overrules clear past precedent, *e. g., Linkletter* v. *Walker,* 381 U. S. 618; *Desist* v. *United States,* 394 U. S. 244; *Williams* v. *United States,* 401 U. S. 646; or disrupts a practice long accepted and widely relied upon, *e. g., Johnson* v. *New Jersey,* 384 U. S. 719; *Stovall* v. *Denno,* 388 U. S. 293; *Cipriano* v. *City of Houma,* 395 U. S. 701.

[3] Even on the erroneous premise that the "retroactivity" of *Massiah* is here involved, the District Court was quite mistaken in stating that "[n]o Court has declared *Massiah* retroactive." This Court, in *McLeod* v. *Ohio,* 381 U. S. 356, reversed, citing *Massiah,* an Ohio conviction because a voluntary confession was admitted in evidence that had been obtained when police officers questioned the petitioner in the absence of counsel a week after he had been indicted. The conviction antedated *Massiah* by almost four years.

cannot, under *Fahy* [v. *Connecticut*, 375 U. S. 85], be conceived of as harmless." 386 U. S., at 23–24. And on the question of whether a jury might possibly have been influenced, the State must "prove beyond a reason- able doubt that the error complained of did not con- tribute to the verdict obtained." *Id.*, at 24.

Neither the District Court nor the Court of Appeals even suggested the possibility of harmless error in this case, and with very good reasons. The Court today re- lies on the fact that the challenged "confession" was only one of several introduced at the petitioner's trial. But it fails to mention that each of the previous state- ments was taken during an 18-day period after arrest but before indictment, when the petitioner was held in jail incommunicado and was questioned almost every day, often for hours at a time. For 10 days the petitioner denied that he had deliberately killed his wife. Finally, during a session in which two detectives working in tan- dem questioned him continuously for some eight hours, the petitioner allegedly confessed. Other statements fol- lowed that one, but all were taken during the period of incommunicado detention.

Under these circumstances, it is hardly surprising that the Miami police chose to plant an officer in the peti- tioner's jail cell two weeks after indictment, in the hope of obtaining admissions less tainted by the indicia of unreliability that surrounded the previous statements. They succeeded in doing so, and the alleged confession thus obtained was truly devastating to the defense at the trial. Langford's testimony was the first evidence of any incriminating statements introduced by the State at the trial, and it was referred to repeatedly by the prosecutor in his final argument.

The state courts determined that the petitioner's pre- indictment statements were voluntary, and that issue, as the Court notes, is not now before us. But the weight

given by a jury to any alleged confession is affected by the circumstances under which it was obtained, and the ability of the petitioner to discredit in the minds of the jury the evidence of his prior statements was undoubtedly destroyed by the strong corroboration and elaboration supplied by the testimony of Officer Langford, who had been unconstitutionally planted in the petitioner's jail cell. Surely there is *at. the least* a reasonable doubt whether in these circumstances the introduction of Langford's testimony did not contribute to the verdict of first-degree murder returned by the jury, particularly where a conviction for a lesser degree of homicide was a distinct possibility on the evidence.

To hold otherwise, in the absence of any finding of harmless error by any of the four courts that have previously ruled on the admissibility of Langford's testimony, is to violate the very principle that the Court restates today: "The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo* but rather to review for violation of federal constitutional standards." *Ante,* at 377.

Despite its admonition, the Court today refuses to rule on the constitutional question squarely presented in this case. That question is whether the great constitutional lesson of *Powell* v. *Alabama* is to be ignored. I would not ignore it, but would honor its "fundamental postulate . . . 'that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard.'" *Powell* v. *Alabama,* 287 U. S., at 71–72.

For these reasons, I would reverse the judgment before us.