Lawrence Lee **BREEDLOVE**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–73–59.

Court of Criminal Appeals of Oklahoma.

Nov. 2, 1973.

Rehearing Denied Nov. 26, 1973.

Stephen Jones, Enid, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., for appellee.

OPINION

BUSSEY, Judge:

Appellant, Lawrence Lee Breedlove, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–72–1882, for the offense of Robbery with Firearms, his punishment was fixed at death by electrocution which was modified by this Court in response to a request of the Governor for advisory opinions.[1] Defendant appeals.

At the trial James Turk testified that on August 4, 1972, he owned a grocery store at 3200 North Western in Oklahoma City. He stayed at the store until approximately 6:00 p.m. when Howard Siler, his wife, Judy, and their son, Chris, replaced him. At approximately 10:55 p.m. he received a telephone call and upon returning to the store, observed various police officers and a crowd of people. When he was permitted to enter the store, he found the cash

---

1. Franklin et al. v. State, Okl.Cr., 507 P.2d 917.

register empty and approximately $182 missing. He identified State's Exhibit 1 as a bank bag similar to one missing from the store.

Bruce Cain, age 13, testified that on the evening of August 4, 1972, he was in an automobile with his father driving down Western Avenue. As they passed Turk's 7–11, he observed a black man in front of the counter at the store, another black man behind the counter and a white man behind the counter with his hands at his sides. He informed his father, who then went around the block and by the store a second time. He observed the two black men push the white man toward the rear of the store. His father drove to their home where he called the police.

Officer Tom Bevel testified that he arrived at Turk's Grocery at approximately 11:55 p.m. and observed two white males lying on the floor in the back room. He proceeded to process the store for fingerprints, take photographs and collect physical evidence. He identified State's Exhibit 12 as three spent .22 caliber hulls that he found in the back room in the area where the bodies were located. He identified various photographs of the scene and three photographs of the bodies of Howard Siler, Judy Siler and Chris Siler. On cross-examination, he testified that the prints he found at the scene were not the prints of the defendant.

Don Rogers, the Lieutenant in charge of the Crime Lab of the Oklahoma City Police Department, testified that he assisted in the technical investigation at the scene. He identified State's Exhibit 12 as hulls given him by Officer Bevel. He identified State's Exhibits 14, 15 and 16 as bullets removed from the brains of the Silers by Dr. Marshall. He identified State's Exhibit 17 as a gun received from Detective Adam Knight. He transported these exhibits to the Oklahoma State Bureau of Investigation and turned them to Ray Lambert.

Officer Fred Weed testified that he arrived at the grocery store at approximately 11:10 p.m. He observed Howard Siler and Chris Siler lying on the floor apparently dead. Judy Siler was still breathing and was transported to Mercy Hospital. He observed spent .22 shells laying on the floor and the cash register drawer was open and empty. He further found Howard Siler's wallet with no money in it and Judy Siler's purse, which still contained money.

Detective Adam Knight testified that on the evening of August 7 or the early morning hours of August 8 he assisted in the arrest of defendant at his residence. He testified that shortly after the arrest, defendant was advised of certain constitutional rights. The trial court thereupon conducted an in-camera hearing to determine the admissibility of any statements that defendant may have made. Officer Knight testified that he had an interview with defendant at approximately 12:40 a.m. on August 8 at the Oklahoma City Police Department. Defendant stated "I see you've got everybody here that is involved in this, so I might as well tell you my part in it." (Tr. 439) Defendant thereupon made both an oral and written statement concerning his participation in the robbery. On cross-examination he denied that defendant was struck, kicked or threatened prior to giving the statement.

Defendant testified in the in-camera hearing that he was not advised of any constitutional rights by Officer Knight but rather was advised of some constitutional rights by Detective Burns. He told the officers that he was not involved in the robbery. Whereupon, they became very angry and attacked him. He subsequently gave a statement to the police officers.

Detective Knight was recalled and testified that he did not see the defendant physically abused or threatened nor did the defendant make any complaints to him that he had been abused.

Detective Burns testified that neither he nor anyone in his presence abused the defendant in any manner nor did the defendant complain that he had been abused.

The court thereupon found from the evidence presented in the in-camera hearing that the statements taken were voluntarily given. The jury was recalled and Officer Knight testified that the defendant stated that on August 4 at about 4:30 p.m. he was talking to co-defendant Glover when co-defendant Draper approached them. Defendant Draper asked him "how he was about robberies." Defendant Draper told him that he had a robbery planned for that evening and asked him if he could participate in it. Defendant Draper asked him if he had a gun and defendant replied that he had a .22 pistol under the dash of his car. Defendant Draper test fired the gun and they returned it to the automobile. At approximately 9:30 p.m. defendant was picked up by defendant Draper, defendant Glover and defendant Carolina. They drove to defendant Carolina's mother's house whereupon defendant Carolina returned with a .22 caliber sawed-off rifle. They went by a 7–11 Store on North Western where defendant Draper stated that "this looks pretty good." Defendant, defendant Draper and defendant Carolina got out of the automobile and went towards the store, leaving defendant Glover in the car. Defendant Carolina stood on the outside of the store while defendant and Draper went inside with their guns drawn. Defendant Draper told defendant to take the woman and child into the back room and watch them. Defendant Draper took the money out of the cash register and also took a money sack and placed it in a brown paper sack. Defendant Draper ordered the man into the back room and ordered all three of them to lie facedown on the floor. Defendant Draper then took defendant's .22 caliber pistol from his hand and fired three or four shots at the people lying on the floor. They returned to their automobile and proceeded to the home of a girlfriend of defendant Draper's. They went into the residence and split the money up.

Detective Knight testified that sometime later defendant advised them of the location of the pistol which he had given to his brother. Defendant accompanied them to an address on Northeast 2nd and Walnut whereupon he found State's Exhibit 17, a .22 caliber pistol.

Oscar Lee Breedlove, defendant's brother, testified that on the Saturday or Sunday following August 4, defendant brought him a .22 caliber pistol. He identified State's Exhibit 17 as the pistol taken from his hotel room by the police. In cross-examination he testified that the police officers broke into his room with drawn guns; that defendant told him to tell the police where the pistol was because "they beat me and made me tell." (Tr. 490)

Detective Burns testified that on August 8, 1972, he went to an address on Northeast 35th Street and found State's Exhibit 1, the bank bag. The address was occupied by someone named Pat. He testified that he was present with other officers when State's Exhibit 17, the pistol, was recovered at the apartment of Oscar Breedlove.

Ray Lambert, a firearms examiner for the Oklahoma State Bureau of Investigation, testified that he received State's Exhibit 12, the cartridge cases, State's Exhibits 14, 15 and 16, the slugs and State's Exhibit 17, the pistol, from Lieutenant Rogers. He testified that he test fired State's Exhibit 17 and compared the test bullet with State's Exhibits 14, 15, and 16. The results were inconclusive because of the damage to the slugs. He further testified that in his opinion State's Exhibit 12, the cartridge cases, were fired from State's Exhibit 17.

Calvin Murphy testified that on August 4, 1972, defendant came to his home and showed him a .22 caliber pistol which "kind of looks" like State's Exhibit 17. Murphy took the gun into the backyard and fired it up in the air. Defendant Draper came up behind him and shot a .38 caliber revolver also up in the air. He heard defendant Draper say he was going to "make a robbery." (Tr. 533) Defendant left at that time and defendant Draper also left. The following day defendant

came over and wanted to see defendant Glover. Defendant told defendant Glover that if "anybody lied on him or something and it was going to kill him or something." (Tr. 534)

Defendant Wayne Glover testified that on the evening of August 4, 1972, he observed defendant Carolina, defendant Draper and defendant in the vicinity of Southeast 15th and High in Oklahoma City. Defendant Glover requested that they take him to his grandmother's house. Glover had been drinking wine, whiskey and beer during the day and as soon as he got in the car, be began dozing. The next thing he remembered was that the car was parked on a dark street. Defendant, defendant Draper and defendant Carolina got out of the car and defendant told him to get up under the wheel. The three returned in a little while and defendant told him to scoot over. After he scooted over he observed a .22 caliber pistol, State's Exhibit 17, laying on the seat between he and defendant. Defendant Draper told defendant to drive to his girl's house. Upon arriving at the house, all four of them were admitted into the house by "Pat." They went into the dining room and defendant, defendant Draper and defendant Carolina pulled out guns and laid them on the table. Defendant Draper also pulled out State's Exhibit 1, the money bag. Money was removed from the bag and divided among the four of them. He testified that he received approximately $45. Defendant Draper stated "I told you me and Breedlove wasn't going to leave any witnesses" and "whoever is going to squeal is going to get hurt." (Tr. 571) He testified that the last time he saw the money bag, it was laying on the table. As they left the house, defendant told the girl that they had ripped off a 7–11 store on Western. The following day, defendant came to his home and made the statement in the presence of Calvin Murphy that "if someone was doing some snitching on him and he found out who it was, they was going to get hurt." (Tr. 577)

The first proposition asserts that the trial court erred in overruling defendant's motion to suppress any statements given by him to police officers. We are of the opinion that this proposition is well taken. The record reflects that Detective Knight advised defendant as follows:

"I advised him that he was under arrest on the robbery murder that had occurred at Thirty-first and North Western. I then took this card out of my identification holder and read these following rights to him: I stated to him that, number one, he had the right to remain silent. Number two: That anything he said can be used against him in Court. Number three: That he has a right to an attorney. Number four: If he is unable to hire an attorney, one would be appointed. Number five: That interrogation may be terminated at any time. I then turned the card over which has on the other side of the card, and after I gave him his warning, I advised him, I said, 'Do you understand each one of these rights I have explained to you?' He stated he did with an affirmative reply. I then advised him of the other warning, I said, 'Having these rights in mind, do you wish to talk to us?' At that time he didn't say anything until he got to the police station when he observed some of the other Defendants, and he said, 'Yes, I might as well since you have got us all here.'" (Tr. 387–388)

The record thus clearly shows that defendant was not advised of his right to have counsel, either retained or appointed, prior to questioning. In the recent case of Gray v. State, Okl.Cr., 506 P.2d 594, we stated in the first two Syllibi:

"1. Upon arrest an accused must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

"2. Warnings which fail to advise an accused that an attorney will be appointed to represent him if he cannot afford one or that he has a right to the presence of an attorney during any questioning, are fatally defective and no evidence obtained as a result of interrogation can be used against him."

See also Reese v. State, Okl.Cr., 462 P.2d 331 and Byers v. Oklahoma City, Okl.Cr., 497 P.2d 1302.

▇ The second proposition contends that the verdict is contrary to the law and to the evidence in that there was not enough competent evidence introduced at trial to prove the defendant guilty beyond a reasonable doubt. Defendant argues that if the alleged confession of defendant and the fruits thereof, the gun, are suppressed that there is not enough competent evidence to corroborate the testimony of the accomplice Glover. We disagree. As discussed in proposition one, we are of the opinion that the confession was improperly admitted, however, the fact that the police officers learned of the location of the gun from the illegal confession does not make the testimony of defendant's brother concerning the gun inadmissible. In Pfeifer v. State, Okl.Cr., 460 P.2d 125, we stated:

"Likewise, we must reject defendant's contention that the testimony of the stock yard [sic] employees, Jessup and Jones, is inadmissable [sic] as evidence obtained by the illegal arrest. In Smith v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1964), certiorari denied 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), the Court excluded testimony of witnesses from the 'fruit of the poisonous tree' concept as follows:

" 'The fact that the *source* of evidence is "tainted" by violation of constitutional or statutory provisions has not precluded the use of that evidence in every circumstance. [citations]

" 'Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions.

But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, "speak for themselves." The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.' 324 F.2d at 881.

"Of further enlightenment on this point is a note in a recent holding of the United States Supreme Court in Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968):
" 'The exclusion of an illegally procured confession and of any testimony obtained in its wake deprives the Government of nothing to which it has any lawful claim and creates no impediment to legitimate methods of investigating and prosecuting crime. On the contrary, the exclusion of evidence causally linked to the Government's illegal activity no more than restores the situation that would have prevailed if the Government had itself obeyed the law.' (392 U.S., at 224, 88 S.Ct., at 2011, 20 L.Ed.2d, at 1052, footnote 8, 9)

"Although there is no positive evidence that the state learned of the challenged evidence 'from an independent source', it is clear that the connection between the lawless conduct of the peace officers and the discovery of the challenged evidence becomes so attenuated as to dissipate the taint. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307."

In Johnson v. State, Okl.Cr., 448 P.2d 266, we stated:

"As we review the cases pertaining to derivative evidence, we find that these cases dealt extensively in the areas of

'search and seizure, and wiretapping' cases. Such application has also been applied in the cases involving witness immunity statutes, as they pertained to the privilege against self-incrimination. Consequently, we think it is illogical to take one part of a sentence in the Miranda Opinion, as being a rule to prohibit derivative evidence. Again quoting from Professor George:

" 'My own position is that one ought not read a lengthy judicial essay any more broadly than necessary because justices as advocates say much more than they ought to make the specific point they have in mind. If the Court wants a derivative evidence rule, it should say so explicitly in a case that directly presents the question on its facts.' "

■ We further observe that defendant Glover's testimony was corroborated not only by the gun but also by the testimony of Detective Burns concerning his finding the bank bag taken in the robbery at Pat's residence. We therefore find this proposition without merit.

■ The final proposition asserts that prejudicial evidence, testimony and comments were so persuasive throughout the trial that so inflamed the passion in the minds of the jurors against the defendant that he was denied his rights to a fair trial. We have carefully examined the record and are of the opinion that with the exceptions of the admission of the illegal confession that the defendant received a fair trial. In Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1, the United States Supreme Court stated:

"In initiating the present habeas corpus proceeding in the District Court, petitioner sought to have his conviction set aside on the ground that the statements he made to police officer Langford should not have been admitted against him. Our review of the record, however, leaves us with no reasonable doubt that the jury at petitioner's 1958 trial would have reached the same verdict without hearing Langford's testimony. The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo* but rather to review for violation of federal constitutional standards. In that process we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court 15 years ago by use of evidence not challenged here; the use of the additional evidence challenged in this proceeding and arguably open to challenge was, beyond reasonable doubt, harmless."

■ We are of the opinion that the evidence of defendant's guilt is overwhelming and that the jury would have reached the same verdict without hearing evidence of defendant's confession. The judgment and sentence as modified to life imprisonment is affirmed.

BLISS, P. J., and BRETT, J., concur.