580 So.2d 1203 (1991)
Susie Ann BALFOUR
v.
STATE of Mississippi.
Nos. 89-KA-0422, 89-KA-0423.
Supreme Court of Mississippi.
May 3, 1991.
Thomas H. Pearson, Cheryl Ann Webster, Clarksdale, for appellant.
Mike C. Moore, Atty. Gen., Deirdre McCrory, W. Glenn Watts, Sp. Asst. Attys. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the Court:

Procedural Posture
This appeal involves two separate cases containing identical issues, similar facts and evidence which, for the sake of economy, have been consolidated. Along with Lawrence Kirby Payne, Susie Ann Balfour was indicted on three counts of armed robbery. On the motion of defense counsel, the trial court ordered severance of the charges and defendants. After separate trials on each of the charges, Balfour was convicted of armed robbery and sentenced in each case to twelve-year terms of imprisonment, to run consecutively. Aggrieved, she brings this appeal. Three issues were presented for our review and decision. Only one merits discussion.

Did the lower court err in admitting into evidence a confession obtained through interrogation initiated by investigators after defendant requested counsel?
We are constrained to answer this question in the affirmative, as the use of Balfour's confession against her during her trials violated her Fifth and Fourteenth Amendment rights as construed in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We are compelled to reverse and remand for a new trial.

Factual Summary
During the months of September and October of 1988, Susie Ann Balfour and Lawrence Kirby Payne frightened residents *1204 of the northern Mississippi countryside, especially convenience store clerks, with their impenitent criminal activity. The two, whose antics were not unlike those of the infamous Bonnie and Clyde, robbed several convenience stores. Their modus operandus consisted of spraying the convenience-store clerk with mace, creating temporary blindness enabling Balfour to take money from the cash drawer.
On October 7, 1988, their criminal activities ended when they were arrested and charged with capital murder and several armed robberies. Balfour was arrested at the home of Mary Payne, the mother of co-defendant, Lawrence Payne. Payne was arrested at the DeSoto County Baptist Hospital. The capital murder charge arose out of the slaying of an officer who apprehended the pair shortly after one of the robberies. That charge is not involved in this appeal. No mention was made of the incident during the armed robbery trials. The occurrence, however, led to Balfour's arrest. It seems that she was under the impression that she had shot Payne rather than the officer and she reported this to Payne's mother. Payne's mother having heard that an officer had been shot called the authorities to report Balfour's presence at her home[1].
Soon after her arrest, Mississippi Highway Patrol Investigators, Creekmore Wright and Kenny Dickerson, interrogated her. These officers presented her with a "Waiver of Rights" form; although she placed her initials after each of the statements on the form, she refused to sign the waiver.
On the morning of October 11, 1988, Balfour made her initial appearance before the DeSoto County Court, Judge Barbee presiding. During the hearing, she informed the judge that her family was thinking about or in the process of retaining private counsel for her representation. The judge advised the officers present to make a phone available for her use so that she might determine the status of her family's efforts. He did not, at that time, appoint an attorney to represent her. Some three days later, the court appointed counsel for Balfour, as her family had not secured legal representation for her.
In the meantime, during the time between her initial appearance and the appointment of counsel, Jimmy Radford, a criminal investigator with the District Attorney's Office in Hernando, and M.E. "Bud" Smith, Chief of Detectives, DeSoto County Police Department, secured an incriminating statement from Balfour. In this statement Balfour confessed to committing the robberies and shooting the officer.
Prior to the trials, Balfour filed a motion to suppress the confession. After a hearing, this motion was overruled and at trial the confession was admitted over objection.
During the suppression hearing, Balfour gave undisputed testimony that she requested a lawyer at the time of arrest and initial questioning by Wright and Dickerson. The trial judge, however, made no findings in this regard. What follows is an examination of the evidence before the court at the suppression hearing.
Jimmy Radford, testifying on direct examination, stated he first became acquainted with Balfour on October 7, 1988, when he charged her with robbery and murder. His testimony was that he saw her twice on October 11, 1988  first, at her initial appearance and later at the county jail, when he and Det. Smith went to the *1205 jail and interviewed her. During this "interview," the defendant was presented with a "Waiver of Rights" document. Upon being presented with the waiver this time, she signed the form and gave an incriminating statement. The "interview" started at 1:24 p.m. It resumed at 2:05 p.m., after a break was taken. At 2:10 p.m., the rights waiver was signed. According to Officer Radford, Balfour made no request for an attorney during the interview and neither he nor the other officer present used force, threats, or promises to obtain the confession. Radford claimed the waiver and the statement were freely and voluntarily given.
On cross-examination, Investigator Radford stated he did not try to get Balfour to sign a right's waiver on October 7, 1988. He also stated while Balfour did not inform him she wanted an attorney on October 7, he only saw her briefly as other investigators, specifically Patrolmen Wright and Dickerson, were talking to her. Additionally, he testified Balfour had no attorney at her initial appearance or at the time of making her statement. He explained that before Balfour gave her statement, he told her parts of what co-defendant Payne said in his statement to the officers.
After Balfour testified, Radford was recalled by the State. During her testimony, Balfour had stated that others were present when the waiver was administered and statement signed. Radford denied this. When asked about the events surrounding waiver and statement, and if Balfour stated she did not want to sign anything without a lawyer, the investigator responded in rebuttal,
We gave her her rights. She said her family, maybe her mother, was going to help her get a lawyer. I offered to let her use the telephone. I said, "If you want to call your lawyer, call your mother, we will do it." I said, "If your family does have you a lawyer, we will stop right now and we will wait, make an appointment with that lawyer to come down."
(emphasis added) He stated Balfour, in response to the above offers, told him she did not need a lawyer and was ready to tell what happened.
Radford did not know if the first waiver form which Balfour had refused to sign had been turned in to the District Attorney's Office or not, as he did not review all the file prior to his interrogation of Balfour. He testified that he was not aware of Balfour's earlier refusal to sign the rights' waiver. He admitted that he was present at her initial appearance when Balfour stated that she wanted to hire or have a lawyer appointed to represent her.
Det. Smith stated he was present when Balfour's rights were read to her on October 11, 1988, and she freely and voluntarily signed the rights' waiver and gave the statement. He stated further that she did not request a lawyer.
On cross-examination, Smith acknowledged that his and Radford's first interrogation of the defendant was October 11, 1988. Although he knew Balfour had been jailed since October 7, he did not know if there were any previous interrogations. When called as a rebuttal witness concerning the events surrounding the October 11 interrogation and statement, Smith admitted that he was present at Balfour's initial appearance where the subject of her retaining counsel was discussed. At the conclusion of this witness' testimony, the state rested.
Balfour was her only witness. She stated that when she was arrested on October 7, she informed Officers Wright and Dickerson she did not wish to say anything without an attorney being present. She refused to sign a rights waiver because she "didn't want to sign anything that would hurt [her] in the case unless [she] had someone else present, an attorney or something." She stated she told her arresting officers she wanted a lawyer. Balfour informed the court of the events surrounding her giving the statement as follows:
Well, Jimmy Radford and Bud Smith came  after they moved me, I was back in the cell in maximum security, they brought me and put me up front ... They came and got me maybe two hours after that and asked me, told me that *1206 they wanted me to go somewhere with them and I said, "Where?" and they said, "We're just going to take a walk." I said, "Well, if it is anything about me signing any kind of papers, I don't want to sign anything. I am still not signing anything." And they said, "Well, we're just going to walk over here." So they took me over across from the jail and they set for a few minutes and then I asked them could I smoke and they said, "Sure." Then I said I had my cigarettes back over to the jail and Jimmy Radford  Bud Smith said I could smoke one of Jimmy Radford's cigarettes, which I really don't smoke his kind ... And then we went from there and I was saying the same thing that the waiver of rights thing or whatever. I said that I didn't want to sign anything until I had an attorney present. And from then on  I told  he said, "Well if you want your lawyer present, we can call him now because I haven't heard anything yet about one, you know." I told them I was suppose [sic] to be seeing Paul Scott and we could all make a statement then when he was present. So they kept on saying 
Q. Did they stop questioning you when you told them that you wanted an attorney?
A. No, sir.
Q. Go ahead.
A. They kept telling me just go on and tell them  they did not tell me anything about that if I made a statement  they didn't say anything about using it as evidence, the statement I was making.
Balfour continued by stating that the officers on October 11, told her Payne "made a statement saying [she] was the cause of everything." She stated Officer Smith mistreated her by allegedly threatening her with the death penalty, hitting her a couple of times, dragging her and placing his knee in her back.
To clarify and contradict this testimony, the state recalled Det. Smith. Officer Smith categorically denied the accusations lodged against him by Balfour.
After reviewing the evidence, the trial court found that the state had proven beyond a reasonable doubt facts essential to admissibility. He stated his satisfaction, from the record and the totality of the circumstances, with the State's proof regarding the voluntariness of the statement given by Balfour on October 11, 1988. The court made no mention whatever of Balfour's assertion of her right to counsel on October 7 and its effect on the subsequent state initiated interrogation.
Immediately following the suppression hearing, the first trial concerning the robbery of Circle K, a twenty-four hour convenience store, ensued and Balfour was convicted. The evidence before the court there is as follows.
Bruce Veale testified that he was working as a cashier at the Circle K when he saw a black female at the door. Veale unlocked the door and let her in the store. He stated she was wearing a black jacket and something on her head similar to "a surgical type of net or something." He described the events occurring after the woman entered as follows
She walked down the candy [aisle] back to the back coolers, and I walked around back to the cash register. She got a 16 ounce bottle of Pepsi, brought it to the counter. She asked me if she could buy beer. And at that time I told her she couldn't buy beer but she had about three minutes to make it to Memphis, because they sold beer until 3:00 o'clock.
At that point, I rang up the soda on the register. She handed me  I told her it was 80 cents and the register opened. And when the register opened, I felt a spray in my eyes. And I went to cover my eyes and I witnessed her arm going to the register. And that's when I told her to take what she wanted and I got out of the way and went over to the sink and was trying to get the stuff that was out of my eyes.
And at that point when I was at the sink putting water in my eye, the drawer evidently fell out and fell on the ground and she walked around the counter and *1207 she was on the floor picking up the drawer. Then she picked the drawer up and walked out and picked the bottle of Pepsi up and walked out the door and that's when she walked out the door I went and picked up the phone and called the police and told them I had been robbed and I was looking out and saw a set tail lights going east on Stateline Road.
At trial, Veale positively identified Balfour as the person who sprayed mace in his eyes and took money from the store.
Patrol Officer John Reynolds of the Southhaven Police Department responded to a call regarding a robbery at a Circle K. Upon arriving at the store, Reynolds was given a description of the suspects and vehicle involved in the robbery, which he broadcast over his radio. (Although no testimony about what ensued immediately was given at trial for fear of prejudicing the jury, it appears from other testimony in the record that Lt. Billy Lance responded to the call and apprehended two suspects fitting the description at the area of Highway 302 and Goodman Road. During the course of the arrest Lance was shot and killed. Other officers were able to hear some of what transpired at this location over Lance's radio.)
Investigator Cleatus Oliver of the Southhaven Police Department also received the call concerning a robbery at Circle K. He responded to the crime scene. He testified that, after processing the scene, he "went to the area of Goodman Road and 302" where he gathered evidence consisting of two canisters of mace. Fingerprints taken from the mace cans matched the defendant's prints according to Clyde Morgan of the Mississippi Crime Lab.
Detective Bud Smith of the DeSoto County Sheriff's Department testified that four to five hours after the robbery, he and another officer observed a small white Toyota matching the description of the suspect vehicle abandoned "about a half a mile north of Goodman Road on Center Hill Road." Found inside the car were a Pepsi bottle and shower cap.
At the conclusion of the evidence, Balfour was adjudged guilty by a jury and sentenced to serve twelve years in custody of the Mississippi Department of Corrections.
The second trial occurred a week later. There Eva Cook testified that on October 4, 1988, at approximately 12:30 p.m., a young black female entered the Mills Self-Service Gas Station in Olive Branch, Mississippi, and the following events took place.
I asked her how she was doing and she began to giggle at me and she walked down that aisle on the left-hand side and got out a Pepsi and brought it up and she handed me a dollar for the Pepsi and I opened the drawer she was struggling to get something out of her pocket and I noticed when she came up it was a can and she started spraying it in my face and I turned my head and she sprayed it all down the side of my face and in the right eye.
* * * * * *
And, it just shocked me. I was just standing  walking backwards, and when I got to the counter in the back, there was a staple gun laying there and I had picked it up and throwed it at her. About the time I throwed it at her, she turned with the drawer, cause she reached over the counter and got the drawer out of the register, and it hit her in the back of the head right here and she just started walking and she turned around and she called me  she told me she said, "You, bitch" and then she walked out the door.
After the robbery, Cook was taken to DeSoto County Baptist Hospital for treatment of her red, swollen eye. She described the woman who robbed her as follows:
a female black about 5'1" tall, she was 25  around 25 years of age, medium complexion, said of course, her black hair, she had "jerry [sic] curls" in her hair, she was dressed in a black leathertype jacket, had it zipped up, she had black blue-type blue jeans, I believe straight legged, and had white tennis shoes. Balfour, who is 5'5" tall, was
*1208 wearing a light-weight black jacket which zipped in front, green jeans, and blue lace shoes, when she was arrested.
Cleatus Oliver of the Southhaven Police Department testified in this trial as well concerning the items he found on Goodman Road, and Clydell Morgan testified again to the fingerprint match.

Disposition
Defendant assigns as error the trial court's admission of her confession because it was obtained through interrogation initiated by the state after she had requested counsel.
As the United States Supreme Court's recently reiterated in Minnick v. Mississippi, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), a case on appeal from this court, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id. 111 S.Ct. at 487. See also, Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Kirkland v. State, 559 So.2d 1046 (Miss. 1990). In both Minnick v. Mississippi, and Edwards v. Arizona, as here, the investigating officers who solicited the tainted confession were unaware of the accused's previous invocation of his right to counsel. Here Officers Smith and Radford testified that they were unaware of the October 7th invocation, but they witnessed Balfour's statements concerning counsel at the initial appearance. Under the teachings of Edwards and Minnick, even if they had not been in attendance at the initial appearance, the state would have been charged with the knowledge of Balfour's previous expression of a desire for counsel. Kirkland v. State, 559 So.2d at 1047-48; Arizona v. Robertson, 486 U.S. 675, 687, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704, 717 (1988).
Balfour requested counsel on at least two occasions, the first time being when she was arrested on October 7, when two patrolmen questioned her. In her testimony, which was not refuted, Balfour stated she asked for an attorney. The bright-line rule of Minnick warns that once the right to counsel is invoked, all questioning at the initiation of the State must cease. Id. At the time of arrest, she refused to either sign a "Waiver of Rights" form or give a statement.
Four days later, she made her initial appearance in the DeSoto County Court. At that hearing, she again invoked her right to counsel. She advised the judge that she wanted an attorney. The lower court told officers present at the hearing to allow the defendant to call her family and ascertain the status of their efforts in securing an attorney. Later that afternoon, Officers Smith and Radford proceeded to Balfour's cell and asked her to go with them. Apparently in an effort to elicit a response, the officers told Balfour that Payne had made a statement implicating her in their criminal activity. Upon hearing this, Balfour acquiesced and wrote an eleven-page statement admitting to the robberies and the shooting.
Once the defendant requested an attorney, all questions prompted by the State were to cease. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). Balfour stated she asked for an attorney at the time of arrest. The only testimony concerning the events occurring on October 7, 1990, comes from her. Conspicuous by its absence is the interrogating officers' version of the events. On the record before this Court, Balfour stated she asked for an attorney and was not going to sign any documents or answer any questions without having a lawyer present; this is buttressed by her refusal to sign the first rights' waiver on October 7. After reading the record, it appears to us Balfour invoked her right to counsel.
The trial court made no findings with respect to Balfour's initial request for counsel. It refers to her refusal to waive her rights only as support for the proposition that Balfour, having been advised of her rights on October 7, knew what they were on October 11 when she gave her statement. The court failed to recognize the effect of Balfour's initial invocation of *1209 her right to counsel. Fact findings made under an erroneous legal standard are not protected by our substantial evidence clearly erroneous standard of review." Leatherwood v. State, 539 So.2d 1378, 1381 (Miss. 1989); McClendon v. State, 539 So.2d 1375, 1377 (Miss. 1989).
Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) prescribes that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing he responded to further police-initiated interrogation even if he has been advised of his rights." Id. at 484, 101 S.Ct. at 1884. (emphasis added) Thus, however knowing, the waiver given by Balfour without the assistance of counsel cannot be valid. Even if Balfour's uncontradicted version of the events of October 7 can be ignored, Balfour could be considered to have invoked her right to counsel when she indicated that she was in the process of retaining counsel. Despite this assertion of a desire for representation, the investigators proceeded to the jail where the defendant was housed and solicited a statement. The officers clearly violated the holding in Minnick and its predecessors. A quote from Minnick, relying on Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) is most fitting here.
"We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
Id. (emphasis in original). The court erred in admitting into evidence this confession obtained in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and its progeny.
The state contends that Balfour would have been convicted under evidence excluding the confession, any arguable technical violation of Edwards is harmless beyond a reasonable doubt. See Jimpson v. State, 532 So.2d 985, 989 (Miss. 1988). Contrary to the state's position, the violation of Edwards and progeny in the case sub judice escapes such simple characterization as a mere technical violation. The confession was obtained after Balfour invoked her right to counsel and in clear violation of the Fifth and Fourteenth Amendments. Accord, United States Ex Rel. Lewis v. Henderson, 421 F. Supp. 674 (S.D.N.Y. 1976) (where all of petitioner's confessions were involuntary, the admission of the confessions was harmful constitutional error). We find no instance where this Court has held the admission of a tainted full confession harmless error.
Even where a harmless error analysis has been deemed consistent with the dictates of the Constitution of the United States and the admission of a tainted full confession held harmless, almost without exception, the court has been presented with other full confessions which passed constitutional muster.[2]See Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of confession obtained in violation of the Fifth and Sixth Amendments held harmless where the jury was presented with overwhelming evidence of defendant's guilt, including no less than three full confessions prior to his indictment); Harrison v. Owen, 682 F.2d 138 (7th Cir.1982) (any error concerning the *1210 admission of police officers' testimony regarding defendant's oral statements obtained in violation of Miranda was harmless where the concededly admissible testimony of defendant's neighbor concerning the same incriminating statements was properly before the court); Brinlee v. Crisp, 608 F.2d 839 (10th Cir.1979) (in-custody statement made by defendant without any advice of rights will not support a claim for habeas relief and was harmless where other statements contained really damaging admissions and were made under circumstances which were not custodial were properly admitted); United States ex rel. Moore v. Follette, 425 F.2d 925 (2nd Cir.1970) (admission of involuntary confession held harmless where a prior confession which was not alleged to be involuntary was permissible). Here, the only confession available is tainted.[3]

Conclusion
For the forgoing reasons, we reverse the judgment and remand this case for a new trial.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
NOTES
[1] Mary Payne called area police officers and told them Susie Balfour was at her house. In a statement given to the officers, she explained,

Approximately 8:00 a.m. on 10-7-88, Susie Balfour walked to my residence.
* * *
Susie said that Lawrence had been shot. I asked her did you shoot the Police? [s]he replied that she did not. She never would tell me your [sic] shot the police, she would just break down and cry.
* * *
I told her that I was going to house to call Sheriff Riley and turn her in. She asked me if she could call her mother.
Susie's mother called and they talked. She told her mother that I was going to turn her in because the police were all around and there was no way for her to get away.
She told me then, "now I am ready for you to call." I called Mr. McClaugh and her called Sheriff Rily [sic] for me.
[2] The exception to the above-stated rule is found in United States v. Murphy, 763 F.2d 202 (6th Cir.1985) which appears to be an anomaly. There, the court held that the admission of incriminating statements made by the defendant was harmless where there existed other overwhelming evidence of guilt including testimony of a number of officers, the victims, and bystanders who had the defendants under constant observation "almost without interruption from shortly before the robbery until their unusual apprehension." 763 F.2d at 209 Moreover, the statement admitted consisted only of the words "You caught us... . We shouldn't have robbed the bank. Get the dog off." uttered at the point of apprehension by police dogs, without police questioning and in the absence of any police misconduct. A divided panel found the statement involuntary because of the defendant's state of mind. The full panel found the admission of the statement harmless beyond a reasonable doubt.
[3] The recent expansion of the harmless error doctrine by the United States Supreme Court in Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) has no application to the matter before us. There, interpreting the federal constitution, the Supreme Court held that a harmless error analysis is permissible where there is a confession obtained in violation of the Fifth Amendment  that is a confession which is coerced or otherwise, involuntary. Prior to the decision in Fulminante, the introduction of coerced confessions could never be considered harmless. See, Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). However in a case subsequent to the decision in Payne v. Arkansas, the Court ruled that the admission of a defendant's statements obtained in violation of the Sixth Amendment is subject to harmless-error analysis. See, Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). Fulminante merely allows all confessions be treated alike with respect to the harmless error analysis for federal constitutional purposes. Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).